# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re:<br><br>Biomoda, Inc.[1],<br><br>Debtor. | Chapter 11<br><br>No. 13-13768-t11 |

## DECLARATION OF MARIA ZANNES IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Maria Zannes, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chairman, Chief Executive Officer, and a Director of Biomoda, Inc. ("Biomoda" or the "Debtor"). I submit this declaration (the "Declaration") on behalf of the Debtor in support of the Debtor's chapter 11 petition and the Debtor's motions and applications filed on the date hereof (the "Petition Date") described in Part II below (collectively, the "First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees at my direction, or my experience with the Debtor's operations and financial condition. In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing or providing for communicating any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently

---

[1] The Debtor's address is 609 Broadway NE, Albuquerque, NM, 87102.

1

testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or experience. I am authorized to submit this Declaration on behalf of the Debtor.

2. I have been employed by the Debtor since December 29, 2010. I have been its Chairman since July 2010, the Chief Executive Officer since December 2010, and a Director since May 2008. Prior to joining Biomoda, I served as President of the Energy Recovery Council, a national waste-to-energy trade group in Washington, D.C., for 10 years. I currently have a consulting practice for private clients in environmental and energy industries, which is unaffiliated with the Debtor. I am also a research associate with Columbia University Earth Engineering Center and co-founder of two research centers at Columbia University. I am licensed to practice law in New Mexico and am an inactive member of the Washington State Bar Association. I received a B.A. degree from the University of New Mexico in 1985 and a J.D. degree from the University of Puget Sound in 1992.

3. Part I of this Declaration describes the business of the Debtor and the developments that led to its filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in the Debtor's chapter 11 case (the "Chapter 11 Case").

## PART I

### Overview of the Debtor and its Operations

#### Introduction

4. Biomoda is a cancer diagnostics company focused on the development and commercialization of cost-effective, non-invasive, accurate and reproducible diagnostic tests for the early detection of cancer. Based on technology that preferentially labels cancer cells with a

2

distinct fluorescent marker that was developed at Los Alamos National Laboratory and trademarked under the name CyPath®, Biomoda's initial product targets lung cancer, the leading cause of cancer deaths worldwide. The CyPath® diagnostic is currently being optimized as part of a research program and can be used only for investigational purposes. Pending U.S. Food and Drug Administration ("FDA") approval, Biomoda's simple in-vitro test for early detection of lung cancer is expected to provide compelling value to the healthcare system through cost savings and improved patient outcomes. Biomoda is publicly traded on the Pink Sheets.

5. Biomoda is seeking FDA approval of its cytology-based screening technology as a Class III medical device under the FDA's pre-market approval process. Pending FDA approval of the initial assay for detection of early-stage lung cancer, Biomoda expects its products to find rapid, broad acceptance in the marketplace by offering high sensitivity and accuracy at the cellular level, simple noninvasive use, and affordable cost. Future product and market extensions will focus on the diagnosis, screening and monitoring of other cancers. Assays for cervical, breast, colorectal, bladder, circulating tumor cell and oral cancers may be developed using Biomoda's technology.

## Proprietary Technology

6. CyPath® is a biomarker that preferentially binds to cancer cells and fluoresces red under blue light. Biomoda's technology is based on a porphyrin molecule that research indicates binds to the low density lipoproteins (LDL) on a cell membrane and fluoresces red. Cancer cells have an overabundance of LDL and their membranes may be more porous than non-cancer cells. When labeled with CyPath®, cancer cells fluoresce more intensely for easy detection and diagnosis. Biomoda has completed a 130-patient proof-of-concept clinical trial with an overall accuracy rate of 81% in diagnosing lung cancer without requiring invasive surgical biopsy.

3

2090525 v1/NY

Current diagnosis of lung cancer requires invasive surgical biopsy and the accepted screening method for lung cancer using low dose computerized tomography (LDCT) has false-positive rates of up to 96%. Biomoda has a definitive roadmap to optimize its assay and achieve sensitivity and specificity of greater than 90%. Biomoda has a patent pending on CyPath®'s specific spectral signature that can be read objectively by computer software to distinguish healthy, pre-cancerous, and cancerous cells.

7. Due to CyPath®'s ability to identify and isolate individual cancer cells, the technology also represents a substantial opportunity to study cancer cells at their earliest stages, including possible identification of cancer stem cells, to better understand cancer's progression.

8. Additionally, because chemotherapeutic agents can be attached to CyPath®, it may be a valuable targeted drug-delivery vehicle by which incorporated therapies may be delivered with greater precision and at more exacting dosages. CyPath® also may be developed for in-vivo imaging and use in cancer surgery, allowing the physician to more precisely extract cancerous tissue and leave healthy tissue intact.

9. Biomoda's technology has significant advantages over potential competitors. There is no commercial early lung cancer diagnostic on the market today that can adequately address the global epidemic of lung cancer. Potential competition falls into several segments: biomarkers, radiology, genomics, proteomics, and methylation. In addition to having significant advantages over these potential competitors, including lower cost, non-invasiveness and ease of use, Biomoda anticipates that CyPath® will be a complement to diagnostic tools as well as a stand-alone diagnostic. The most important differential is that all the potential competing technologies will only identify an expression of lung cancer, whereas CyPath® identifies the

4

2090525 v1/NY

cancer cell itself, potentially reducing the number of unnecessary biopsies and invasive procedures. Furthermore, genetic and protein markers primarily identify a patient's risk of contracting cancer and do not result in direct diagnosis of cancer, whereas CyPath® provides for identification of specific cancer cells that can be verified by medical professionals for diagnosis.

10. To protect the present and potential value of CyPath®, Biomoda has developed and will continue to develop an extensive U.S. and international patent portfolio, presently comprised of twenty-five issued patents and twelve patents pending.

### Optimization Commercialization Program

11. On July 23, 2013, Biomoda signed an agreement with the University of Texas Health Science Center in San Antonio (UTHSCSA) to work cooperatively to complete research necessary to optimize its CyPath® assay and secure economic development and research funds for optimization and clinical research with the objective of further increasing CyPath®'s accuracy rate and obtaining FDA clearance and approval for commercialization (the "Optimization Program"). In connection with the Optimization Program, Biomoda will relocate and establish a laboratory in San Antonio where its research team will work with Vivienne I. Rebel, M.D., Ph.D., among others at UTHSCSA. In addition to completion of the Optimization Program, Biomoda will work with Dr. Rebel to secure additional grants for research and development through several funds, including the Cancer Prevention & Research Institute of Texas that has made more than $3 billion in awards available for cancer research.

### Business Operations

12. Biomoda's current research and development operations, laboratory functions, and administrative offices are located at 609 Broadway NE in Albuquerque, New Mexico. Biomoda is party to an agreement (the "License Agreement") with WESST Corp., a not-for-

profit corporation that established the WESST Enterprise Center ("Enterprise Center"), a business incubator designed to assist start-up businesses and entrepreneurs. WESST Corp. is party to an agreement with the City of Albuquerque for the operation of the Enterprise Center. The License Agreement grants Biomoda a license to use space located within the Enterprise Center and also provides for Biomoda's use of various support services including, among others, the use of copying and fax machines, mail sorting and distribution, telephone and internet services, and utilities.

13. Biomoda currently employs four individuals all of whom are full-time salaried employees.

14. Biomoda has been in the research and development stage since its inception and thus has not generated any significant revenues from its operations. As of the Petition Date, Biomoda has assets with a book value of approximately $650,000 and aggregate liabilities of approximately $3,135,675, including unsecured prepetition claims of approximately $1,840,675.

## Corporate Structure and Management

15. Biomoda, a New Mexico corporation, was founded in 1990 as a privately owned C Corporation. In November 2006, Biomoda filed with the Securities and Exchange Commission to be a publically traded company on the Over-The-Counter Bulletin Board using an initial market maker and a 15C 211 filing with NASD. Biomoda remained current with its required filings until March 30, 2013 when it failed to file its 10K annual report due to a lack of funds necessary to prepare the annual report.

16. Biomoda is currently authorized to issue two classes of stock which are designated common stock and preferred stock. Biomoda is authorized to issue 700,000,000 shares of common stock and approximately 176,363,961 shares of common stock are currently

6

Case 13-13768-t11    Doc 11    Filed 11/20/13    Entered 11/20/13 17:10:00 Page 6 of 15
2090525 v1/NY

outstanding. Biomoda is authorized to issue 4,000,000 shares of preferred stock, of which 100 shares are outstanding.

17. Biomoda's General Counsel and Corporate Secretary is Timothy Zannes. Mr. Zannes joined Biomoda on November 2, 2007. The following individuals, in addition to me, are members of Biomoda's Board of Directors: David Lambros and Lewis White. Mr. Lambros was the elected law director of Brook Park, Ohio and presently serves as the law director of the Village of Valley View and the Village of Kelley's Island, Ohio. Mr. Lambros has practiced law for more than 25 years and served on various boards, including Commerce Exchange Bank and Southwest General Hospital. Mr. Lambros presently is a director on the Systems Board at Southwest General Hospital, a multi-million dollar company. Mr. White is Chief Executive Officer and Director of New Energies Nebraska, LLC, a subsidiary of Standard Alcohol Company. Previously, Mr. White was CEO of Los Hojas Corporation and owned a successful childcare business for 20 years.

**Capital Structure**

18. Between July 24, 2012 and October 16, 2013, Biomoda entered into a series of Convertible Loan Agreements (collectively, the "Prepetition Loan Agreements") by and between Biomoda, as borrower, and certain individual lenders and lender groups (individually, a "Lender," and collectively, the "Lending Group"). A list of the Lenders in the Lending Group is attached hereto as Exhibit A. In the aggregate, the Lending Group agreed to lend Biomoda approximately $1,295,000 in principal amounts (collectively, the "Loan") bearing interest at a rate of eight percent per annum, compounded annually (collectively, the "Loan Amount"). In connection with the Loan, Biomoda agreed to pay the Lending Group a loan origination fee of ten percent of the Loan Amount. The Loan maturity date is July 24, 2014 unless converted to

equity as follows: in the event that the Debtor receives Bankruptcy Court approval of a chapter 11 plan in which, among other things, Biomoda converts from a publicly held to privately held corporation, then upon the effective date of such plan, each Lender will have the right to have the Debtor convert such Lender's respective outstanding Loan Amount into shares of the reorganized Debtor in accordance with the terms of the Prepetition Loan Agreements.

19. As collateral for the Loan, the Debtor granted the Lending Group a security interest in the Debtor's entire issued and pending United States and international patent portfolio (collectively, the "Collateral") as documented in those certain Patent Security Agreements entered into simultaneously with the Prepetition Loan Agreements by and among Biomoda and the Lending Group (collectively, the "Prepetition Security Agreements").

20. Further, under the terms of the Prepetition Loan Agreements, the Debtor may borrow up to $1,450,000 in additional financing (the "Additional Financing") from one or more of the current lenders or a new lender or lenders. To secure repayment of any such Additional Financing, the Debtor may grant the new lenders a security interest in the Collateral with the same priority and right in payment as the Lending Group's security interest.

21. As of the Petition Date, the outstanding principal balance of the Loans was approximately $1,462,709 (the "Prepetition Obligations").

**Circumstances Leading to the Commencement of the Chapter 11 Case**

22. Certain contractual obligations associated with the issuance of warrants to various hedge funds in March 2010 and September 2010 have diluted the Debtor's stock price and obligated the Debtor to make more than 200 million shares of common stock available at a price of one cent per share upon the exercise of these outstanding warrants and options. The dilutive effect of these potential share issuances has adversely impacted the Debtor's ability to secure

8

new funding for research and development. The present public company structure has left the Debtor vulnerable to the hedge funds holding the exercise rights for these warrants.

23. Biomoda's management has been consulting with various restructuring experts for more than a year and a half to develop a plan to restructure and take Biomoda from a public company to a clean, debt-free, private company within four-to-six months after the chapter 11 filing in order to focus on the Debtor's promising Optimization Program. The Optimization Program will be lead by Vivienne Rebel, M.D., PhD., who has assembled a team of physicians and researchers to work with Biomoda researchers and physicist on a multi-step program of development. An Interdisciplinary Review Team (IRT) consisting of 5-7 physicians and researchers also will consult on an on-going basis with Biomoda in development of the lung cancer diagnostic technology and its expansion into other cancer applications. Dr. Rebel and Biomoda will conduct research to optimize sample collection, sample preparation and labeling of a cell suspension assay capable of evaluation using flow cytometry. A flow cytometer allows researchers to evaluate individual cells in a sample, providing Biomoda with the ability to distinguish and allow analysis of individual cancer cells in a sample. Furthermore, the cell suspension assay will allow for reading of an entire sample in an automated fashion, providing for use of the diagnostic in large populations. The Optimization Plan also will improve the assay's ability to correctly classify cells into cancer, non-cancer, precancerous and inflamed. As part of the Optimization Plan, Biomoda will establish parameters that distinguish non-cancerous from cancerous cells; and within the latter group adenocarcinoma from squamous carcinoma, with high specificity.

9
Case 13-13768-t11    Doc 11    Filed 11/20/13    Entered 11/20/13 17:10:00 Page 9 of 15
2090525 v1/NY

## PART II — First Day Motions and Applications

24. In order to enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case and to preserve the value of its assets, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration. A summary of the relief sought in each First Day Motion is set forth below.

25. I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its current business operations; and (b) is essential to preserving the value of the Debtor's assets for the benefit of its estate and creditors as it attempts to restructure.

### A. MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING ON THE DEBTOR'S MOTION (the "DIP Motion")

26. Prior to the Petition Date, the Debtor entered into that certain *Debtor-in-Possession Credit Facility Term Sheet* dated as of November 15, 2013 (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Term Sheet") by and between the Debtor, as borrower, and myself, ACH Consultants, LLC, and Steven Girgenti, as lenders (each a "DIP Lender" and collectively the "DIP Lenders"). As more fully described in the DIP Motion, the DIP Term Sheet provides for a multiple draw term loan facility (the "DIP Facility") in an aggregate principal amount of up to $100,000 (the "DIP Loan").

27. I believe that the Debtor has negotiated the DIP Term Sheet in good faith and at arm's length with the DIP Lenders. The Debtor believes that the terms of the DIP Term Sheet

are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

28. The only source of secured credit available to the Debtor at this time is the DIP Facility. The Debtor requires the financing under the DIP Facility in order to satisfy its postpetition liquidity needs during its reorganization process.

29. The Debtor seeks to obtain approval of the DIP Facility in order to minimize disruption of its operations and to pay operating expenses which are critical to its continued viability as a going concern business, including relocation of its operations to San Antonio, Texas, and, therefore, to maintain its value as a going concern business.

30. The Debtor's prepetition secured lenders (collectively, the "Prepetition Lenders") have consented to the Debtor's proposed DIP Facility pursuant to the terms of that certain *Plan Support Agreement* dated as of November 5, 2013 (the "Plan Support Agreement") by and between the Debtor and the Debtor's Prepetition Lenders, whereby the Prepetition Lenders have agreed to, among other things, (i) forbear from exercising any of their respective remedies under the loan documents related to each of the prepetition secured loan facilities, and (ii) support the Debtor's efforts to reorganize and exit this chapter 11 case as a going concern.

31. After considering all of its alternatives with respect to postpetition financing in this difficult economic environment, the Debtor concluded, in an exercise of its sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Term Sheet and the proposed Interim Order represent the best financing presently available to the Debtor.

32. In order to avoid the immediate and irreparable harm to the Debtor's business operations and the estate that would result should such financing not be made available at this time, the Debtor seeks, among other things, interim approval of the DIP Motion.

    **B. MOTION OF DEBTOR FOR ENTRY OF AN ORDER UNDER 11 U.S.C. §§ 105, 363, 364, 503(b), 1107, AND 1108 AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, AND, (IV) INTERIM AND FINAL WAIVERS OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS (the "Cash Management Motion")**

33. In the ordinary course of business, the Debtor maintains one operating account (the "Operating Account" or the "Bank Account") with Wells Fargo Bank, N.A. ("Wells Fargo" or the "Cash Management Bank"). As of the Petition Date, the Debtor believes there are no amounts owing to Wells Fargo on account of services rendered prepetition. One debit card in my name is tied to the Bank Account and all charges to the debit card (including supplies, lab reagents, etc.) are submitted for expense reimbursement and are approved by Lewis White, a member of the Debtor's board of directors.

34. By the Cash Management Motion, the Debtor seeks authorization (1) to maintain its existing Bank Account and to pay any prepetition banking fees imposed by the Cash Management Bank, if any, (2) to continue using existing business forms and checks, (3) to continue using its existing Cash Management System, and (4) for interim and final waivers of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code. To minimize the expense to the estate and to avoid any confusion with suppliers, customers, and employees, the Debtor respectfully requests that the Court grant the Cash Management Motion.

12

2090525 v1/NY

C. **DEBTOR'S MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363, AND 507(a) FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (I) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION; (II) REMIT WITHHOLDING OBLIGATIONS; (III) MAINTAIN EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS; AND (IV) HAVE APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS PRESENTED FOR PAYMENT AND HONOR CERTAIN FUND TRANSFER REQUESTS (the "Wage Motion")**

35. In the ordinary course of its business, the Debtor incurs payroll and employee benefits obligations to its employees for the performance of services. As of the Petition Date, the Debtor employs four individuals (collectively, the "Employees"), all of whom are salaried employees. The Debtor entered into employment agreements with each of the current Employees, which provide for, *inter alia*, each respective Employee's benefits as summarized in the Wage Motion.

36. The Debtor has incurred obligations with respect to the Employees relating to the period prior to the Petition Date. Certain of these costs and obligations are outstanding, due and payable now, while others will become due and payable in the ordinary course of the Debtor's business after the Petition Date.

37. By the Wage Motion, the Debtor requests, under sections 105(a), 363(b) and 507(a) of the Bankruptcy Code, entry of an order authorizing, but not requiring, the Debtor to (i) pay, in its sole discretion, Wage Obligations, Expense Reimbursements, Payroll Taxes, and Employee Benefits (each as defined in the Wage Motion, and collectively, the "Employee Obligations"), and costs incident to the foregoing, and (ii) maintain and continue to honor its practices, programs, and policies for its employees (the "Employee Benefits") as they were in effect on the Petition Date, and as such may be modified, amended, or supplemented from time

to time in the ordinary course; pay costs incident to the foregoing; and remit payment for taxes as applicable. The Debtor submits that any delay in processing regular payments to Employees would cause irreparable harm to the Debtor and its business and assets and threaten the Debtor's restructuring efforts

*[Remainder of Page Intentionally Left Blank]*

2090525 v1/NY

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2013

/s/ Maria Zannes
Maria Zannes

2090525 v1/NY